UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Philips Medical Capital, LLC, a Delaware limited liability company, | No. C-06- 4470 JSW (WDB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION RE APPLICATIONS FOR WRITS OF ATTACHMENT AND WRIT OF POSSESSION** |
| MEDICAL INSIGHTS DIAGNOSTICS CENTERS, INC., a California corporation, et al., | |
| Defendants. | |
| _____/ | |
| and related cross action | |
| _____/ | |

## I.   INTRODUCTION

Plaintiff Philips Medical Capital (PMC) asserts a claim for breach of contract against MIDC alleging that MIDC defaulted on its obligation to make payments for medical equipment, an MRI machine, that MIDC allegedly leased from PMC.  See, Notice of Removal, filed July 21, 2006, attaching Complaint, filed in state court on April 14, 2006 ("Complaint").  According to plaintiff, PMC financed the acquisition of the goods which were supplied by a company named

United States District Court

For the Northern District of California

Philips Medical <u>Systems</u> and a company named Vital Works.[1]  Plaintiff also asserts claims to enforce "Guaranty" agreements signed by the individual defendants, who are principals and/or shareholders of MIDC.  *Id.*

Pursuant to F.R.C.P. 64 and the California Code of Civil Procedure,[2] PMC filed four applications for writs of attachment (one against MIDC and one against each of the individual defendants[3]) and one application for writ of possession.  On August 8, 2006, the District Court referred these matters to this court for Report and Recommendation.

On August 18, 2006, defendants filed counterclaims against PMC and claims against Philips Medical Systems.  See, Amended Counter Complaint and Third Party Claim for Damages, Restitution, and Injunction ("Counter Complaint").  Declaration of William T. Webb, Esq., in Support of . . . Opposition to Application for Right to Attach Order and for Writ of Possession, filed August 30, 2006, ("Webb Decl.") at Ex. 7.  Defendants' "cross action" contains fifteen claims, one of which alleges that PMC and PMS fraudulently induced MIDC to purchase the subject MRI equipment.

On September 20, 2006, the court conducted a hearing in connection with plaintiff's Applications for Writs of Attachment against defendants MIDC, Dr.

[1]The MRI machine includes multiple pieces of equipment.  The evidence supports an inference that at least some of that equipment was supplied by a nonparty named Vital Works. Declaration of Ray Crouse in Support of Applications for Writ of Attachment, filed August 4, 2006, ("Crouse Decl."), at Ex. 2.  However, for purposes of these writ applications the parties treat all equipment and all debt the same without distinguishing among providers.  Accordingly, for purposes of these writs we do not distinguish between equipment provided by Philips Medical Systems and that provided by Vital Works.

[2]Cal.C.C.P. §§483.010 et seq., §§484.090 et seq., §§512.010 et seq.

[3]The five writ applications are nearly identical.  However, where it is necessary to cite a specific application, we use the name of the party against whom the writ is sought.  *E.g.*, "Lynch Motion" and "MIDC Motion" refer to PMC's applications for a writ of attachment against Mr. Lynch and against MIDC respectively.

2

Williams, Dr. Gronner, and Mr. Lynch and on plaintiff's Application for Writ of Possession.

The court makes the following REPORT AND RECOMMENDATION.

## II.    DISCUSSION

The contract between PMC and MIDC consists of the Master Lease Agreement and Schedules 1-4. Declaration of Ray Crouse in Support of Applications for Writ of Attachment, filed August 4, 2006, ("Crouse Decl."), at Ex. 1-5.[4] The Master Lease Agreement contains a choice of law provision in which the parties stipulate that Pennsylvania law applies to claims based on the contract. Crouse Decl., at Ex. 1, ¶20. The parties agree that <u>Pennsylvania</u> law applies to construction and interpretation of the contract(s) and that <u>California</u> law applies to the procedural requirements for obtaining writs of attachment and possession. Transcript, September 20, 2006, hearing.

### A.    <u>Plaintiff's Applications for Writs of Attachment</u>

Plaintiff is entitled to a writ of attachment if it demonstrates (1) that the claim is one that is subject to attachment, (2) that the claim is "probably valid," (3) that plaintiff does not seek the writ for a purpose other than recovery on the claim, and (4) that the amount to be secured by the writ is more than zero. Cal. C.C.P. §§483.010, 484.010, and 484.090. Defendants do not appear to dispute factors (1), (3) and (4).[5] Defendants argue that plaintiff cannot demonstrate the "probable validity" of its claim. If plaintiff demonstrates its entitlement to a writ of attachment then the court also must consider defendants' claims that specified

_____

[4]Citations to the Crouse Declaration refer to the declaration filed in support of the Lynch Motion.

[5]Cal. C.C.P. §483.010(a) provides for writs of attachment on claims for money, based on contract, where the amount owed is readily ascertainable and not less than $500.

3

property is exempt from attachment.  Finally, if the Court grants plaintiff's request for a writ of attachment, we must establish the amount of any undertaking that plaintiff must post.  Cal. C.C.P. §484.090.

"A claim has 'probable validity' where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim."  Cal. C.C.P. §481.190.  In order to make this determination the court must evaluate the "relative merits" of the parties' competing contentions and determine the "probable outcome of the litigation."  *Loeb & Loeb v. Beverly Glen Music, Inc.*, 166 Cal.App.3d 1110 (2d Dist 1985).  Furthermore, California law requires that we make these judgments based on <u>evidence</u>.  Cal. C.C.P. §§482.040 and 484.030. We may not recommend findings based on speculation.  This requirement places us in a awkward position because we are required to make these judgments at a point in the litigation that precedes substantial discovery.  Although we feel somewhat disabled by the nascent state of the evidence, we note that none of the judgments we render about the merits at this juncture is final or otherwise will prejudice defendants' ability to litigate the issues.[6]  We also feel compelled to note that it appears that defendants have not been without means or impetus to start compiling evidence in support of their claims.[7]

Before evaluating the relative merits of the parties' claims, we briefly describe the parties' contentions.

---

[6]"A court's determinations under the attachment law have no effect on the determination of any issues in the action, nor may the court's determination regarding the attachment be given in evidence or referred to at trial."  *Loeb & Loeb*, 166 Cal. App. 3d at 1117 citing Cal.C.C.P. §484.100.

[7]We recognize that the deadline for providing initial disclosures has not yet passed. F.R.C.P. 26(a).  However, defendants have known since at least April 200<u>5</u>, when PMC's collections personnel contacted defendants about their default, that a conflict was imminent. MIDC could have begun compiling information in its defense at that time.  Additionally, once defendants removed plaintiff's state court action on July 21, 2006, they had access to processes that would permit them to seek leave of the Court to conduct discovery before the time specified in Rule 26(d).  *E.g.*, Federal Rules of Civil Procedure 26(d), 30(a)(2)(C), 31(a)(2)(C), 33(a), and 34(b).  It does not appear that defendant utilized these processes.

4

Plaintiff claims that it and MIDC are parties to a contract that constitutes a "finance lease" under Pennsylvania's version of the Uniform Commercial Code ("UCC").[8]  The contract consists of the Master Lease Agreement ("MLA") and Schedules 1-4.  Crouse Decl., at Ex. 1-5.  Plaintiff alleges that MIDC ordered medical equipment from independent entities ("providers" or "suppliers"), Philips Medical Systems ("PMS") and Vital Works and that plaintiff simply financed those transactions.  The MLA contains the general provisions of the so-called "lease," and each of the four Schedules relates to the acquisition of specific equipment.  Schedule 1 indicates that the equipment obtained under that so-called lease was provided by Vital Works.  The equipment provided under Schedules 2-4 was supplied by PMS.[9]

MIDC has ceased making payments due under its contract with PMC claiming, among other things, that the goods were defective and/or did not perform as expressly warranted.  However, under a true "finance lease" MIDC's obligation to pay plaintiff would be "absolute and unconditional."  See, UCC, Division 2A.  No warranties relating to the products' fitness run from plaintiff to MIDC, and MIDC would be obligated to pay plaintiff under the agreement even if the equipment were defective.  Typically, under a "finance lease," the provider of the equipment sells the equipment to the lessor with warranties, and those warranties run through to the lessee (putatively MIDC).  Under this arrangement MIDC's only recourse for defective equipment would be against the provider.

Defendants argue that the contract is not in fact a "finance lease" but is a "security agreement" disguised as a lease.  It is possible that the transaction between PMC and MIDC also constitutes a sales agreement, but defendants assert

---

[8]References to the UCC throughout are to Pennsylvania's UCC and not to the Model UCC.

[9]See, note 1.

5

1    that, without discovery, they cannot tell with certainty whether the true seller is

2    PMC or PMS.  Transcript September 20, 2006, hearing.[10]

3        Defendants contend that PMC is responsible for implied warranties of

4    fitness and merchantability either because PMC constitutes the "seller" of the

5    equipment or because it would be unfair under the facts of this case to enforce the

6    disclaimers of warranties contained in the agreement.  Defendants also contend

7    that they are not obligated to pay PMC because MIDC never "accepted" the

8    equipment and/or effectively revoked acceptance of the equipment, thus nullifying

9    the contract (regardless of whether we construe it as a "lease" or a "security

10   agreement").  Finally, defendants argue that the contract is voidable as a result of

11   fraud.  See, Counter Complaint.

12

13                 1.    **Is the contract a "finance lease?"**

14       Whether a contract constitutes a "finance lease," a "sales agreement" or a

15   "security agreement" is governed by the UCC.[11]

16       A "lease" is " [a] transfer of right to possession and use of goods for a term

17   in return for consideration, but a sale, including . . . a retention or creation of a

18   security interest is not a lease."  13 Pa.C.S. §2A103 (emphasis added).  A "finance

19   lease" is a lease,

20       with respect to which:
         (1) the lessor does not select, manufacture or supply the goods;
21       (2) the lessor acquires the goods or the right to possession and use of
         the goods in connection with the lease; and
22       (3) one of the following occurs:
             (i) the lessee receives a copy of the contract by which the
23           lessor acquired the goods . . . ,
             (ii) the lessee's approval of the contract by which the
24           lessor acquired the goods . . . is a condition to
             effectiveness of the lease contract,

25

26   _____

27   [10]As we explain *infra*, at this juncture, it is not necessary for us to resolve this issue.

28   [11]Division 2 governs sales; Division 2A governs leases; and Division 9 governs security
     agreements.  Note that Pennsylvania uses the term "Division," whereas the Model UCC and
     many other states use the term "Article."

1
2
3
4
5
6
7
8
9

> (iii) the lessee, before signing the lease contract, receives an accurate and complete statement designating the promises and warranties, and any disclaimers of warranties, . . . , provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods . . . , or
> (iv) . . . the lessor, before the lessee signs the lease contract, informs the lessee, in writing: (A) of the identity of the person supplying the goods to the lessor, unless the lessee has selected that person and directed the lessor to acquire the goods . . . from that person; (B) that the lessee is entitled under this division to the promises and warranties, . . . provided to the lessor by the person supplying the goods . . . ; and (C) that the lessee may communicate with the person supplying the goods to the lessor and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitation of them or of remedies.

10   13 Pa.C.S. §2A103.

11          It is true that the subject "Schedules" and paragraphs 2, 5, and 19 of the

12   MLA employ terms that appear to create a "finance lease."  It also is true that at

13   least one Pennsylvania court has held that this type of language is sufficient to

14   create a finance lease even where the lessor did not complete all the "formalities"

15   for doing so.  *De Lage Landen Fin'l Serv., Inc., v. M.B. Mngmt. Co.,* 888 A.2d 895

16   (Pa. Super. 2005).

17          Nonetheless, we RECOMMEND that the District Court find that plaintiff

18   has <u>failed</u> to show that it is more likely than not to obtain a judgment that the

19   MLA and Schedules 1-4 constitute a "finance lease."

20          We make this recommendation because the MLA and Schedules 1-4 also

21   contain language that render them <u>per se</u> a "security agreement" under

22   Pennsylvania law, and a "security agreement" cannot be a "lease."  13 Pa.C.S.

23   §2A103.

24   //

25   //

26   //

27   //

28   //

7

In a section labeled "general definitions" the UCC says the following about whether a transaction creates a "lease" or a "security interest."

> **Determination of lease or security interest.** -- Whether a transaction creates a lease or security interest is determined by the facts of each case; <u>however</u>:
> (i) A transaction <u>creates a security interest</u> if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee and: . . . . . .

> (D) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

13 Pa.C.S. §1201 (emphasis added).

If the factors listed in subparagraph (i) are satisfied the transaction at issue constitutes a <u>per</u> <u>se</u> "security interest." *In re Pillowtex, Inc.*, 349 F.3d 711 (3rd Cir. 2003); *In re Murray*, 191 B.R. 309 (E.D.Pa. 1996); *In re JII Liquidating, Inc.*, 341 B.R. 256 (N.D. Ill. 2006). The MLA together with Schedules 1-4 include terms that render the transaction <u>per</u> <u>se</u> a security agreement under Pennsylvania's UCC.[12]  First, the MLA is not subject to termination. That document states that "a lease may not be terminated or canceled for any reason whatsoever, except as expressly provided in the Lease [Schedule]," and the Schedules do not appear to provide for cancellation. Webb Decl., at Ex. 7 (MLA, attached as Ex 4 to Counter Claim, at ¶2) and Crouse Decl., at Ex. 1-5.[13]  Second, the Schedules provide MIDC

---

[12]The opinion in *De Lage* contains no indication that the contract therein contained this type of language.

[13]The MLA is attached as Exhibit 1 to the Crouse Declaration and can be found at Exhibit 7 to the Webb Declaration. (Exhibit 7 includes defendants' Counter Claim. The MLA is attached as Exhibit 4 to the Counter Claim). Our copy of Exhibit 1 to the Crouse Declaration is missing the first page of the contract. Accordingly, we refer the District Court to the Webb Declaration for specific provisions of the MLA.

an option to purchase the equipment at the end of the lease for nominal

consideration ($1.00).[14]  Crouse Decl., at Ex. 2-5.

Other provisions of the MLA strongly suggest that the parties were aware

that they were creating a <u>security interest</u>.[15]  Significantly, the MLA states

> *Except* for any lease where the Lessee has a . . . $1 purchase option, it
> is the intent of the parties that each Lease is a <u>true lease</u> under the
> UCC, . . .  For any Lease where Lessee has a $1.00 purchase option . .
> . or if this Agreement or any Lease hereunder is *otherwise* deemed at
> any time to be one *intended as a security*, then Lessee grants Lessor a
> *security interest* in the [equipment] . . .

Webb Decl., at Ex. 7 (MLA, attached as Ex 4 to Counter Claim, at ¶15) (emphasis

added).  As noted, the Schedules grant MIDC a $1.00 purchase option.  Crouse

Decl., at Ex. 2-5.[16]

Because the parties' contract includes language that would constitute a per

se "security interest" and because a "security interest" cannot be a "lease," we

RECOMMEND that the District Court find that plaintiff has failed to demonstrate

the probable validity of its claim that the MLA and Schedules constitute a "finance

lease."  It is more likely that the contract will be deemed a "security agreement"

governed by Division 9 of Pennsylvania's UCC.

---

[14]Defendants argue that the MLA is not a finance lease for three reasons: (1) defendant has no right to cancel the agreement and has an option to purchase for only $1.00, (2) formalities of finance lease formation were not followed, and (3) where the supplier and the lessor are affiliates, whether the contract is a finance lease depends on the facts of the case.
Because we recommend that the District Court find that the agreement more likely than not constitutes a security agreement based on the first reason, we do not address defendants' remaining arguments.

[15]The UCC is clear, however, that the intent of the parties is not the relevant inquiry for commercial transactions in this universe.  The parties may have intended to create a lease but in effect created a security agreement.  The court is to focus on the economic realities created by the transaction.

[16]The MLA also states generally that the subject equipment is the property of the <u>lessor</u> but then says, "[n]otwithstanding the preceding sentence, for Leases with a $1.00 purchase option . . ., <u>Lessee</u> shall be deemed to be the <u>owner</u> thereof solely for the purposes of state and local sales and use tax."  Webb Decl., at Ex. 7 (MLA) at ¶6.  We acknowledge that under §1201 of the UCC the lessee's assumption of the duty to pay taxes does not necessarily create a security interest.  13 Pa.C.S. §1201 ("security interest" at (5)(ii)(B)).  Nonetheless, this is an additional factor for the court to consider.
Also note, plaintiff appears to concede that the agreement created a security interest. Motion at 11.

9

1    The MLA and Schedules also might constitute a "sales and security

2    agreement."  PMC contends that the MLA and Schedules amount only to a

3    "security agreement."  If the Court finds that the contract is not a finance lease,

4    then it is PMC's view that the goods were sold by PMS directly to MIDC, and a

5    set of different documents represent that "sale" transaction (*e.g.*, invoices, order

6    forms).  In contrast, PMS intends to argue that it transferred title to PMC and,

7    therefore, it was PMC who sold the goods to MIDC.  Defendants state that they

8    are in the dark about the true nature of the agreement between PMS and PMC, and

9    that without additional discovery (primarily about who held title to the goods at

10   the time of the "sale") they cannot say with certainty who should be deemed the

11   "Seller" of the MRI equipment.

12   Whether the contract also constitutes a "sales" agreement is potentially

13   pertinent because, if the MLA and Schedules constitute a "sales and security

14   agreement," the contract is governed by both Divisions 2 and 9 of Pennsylvania's

15   UCC.  If the contract is simply a "security agreement" then it is governed only by

16   Division 9.  Division 9 does not address several of the issues we must resolve

17   (*e.g.*, what constitutes "acceptance" or "revocation").  However, for current

18   purposes, we need not determine whether the contract also amounts to a "sales"

19   agreement because the parties agree that, with respect to commercial transactions,

20   where the governing Division of the UCC does not address an issue, the issue

21   becomes a matter of common law and Pennsylvania courts will look to other

22   Divisions of the UCC to fill in the gaps left by the governing Division.  *E.g., Beck-*

23   *Hummel v. Ski Shawnee, Inc.,* 902 A.2d 1266, n.12 (PA Super. 2006).  The UCC,

24   therefore, appears to be the appropriate source of guidance regardless of whether

25   the contract is or is not a "sales" agreement.  Neither party has presented authority

26   to the contrary.

27

28

10

1    Having concluded that the parties' transaction is not a "finance lease," we

2    next consider whether PMC has nonetheless demonstrated the probable validity of

3    its claim that it is entitled to unconditional payment from MIDC.

4

5    **2.    Does MIDC have an absolute and unconditional obligation**

6    **to pay PMC for the goods even if the goods are defective?**

7    Even if the parties' agreement does not qualify as a "finance lease," plaintiff

8    argues that the express terms of the MLA effectively disclaim all warranties of

9    merchantability and fitness and create an "absolute and unconditional" obligation

10   by MIDC to pay PMC regardless of whether the products are defective.

11   The central tenet of the UCC is "freedom of the parties to contract." See,

12   Official Comment to 13 Pa.C.S. §2A101 and 13 Pa.C.S. §1102.  The UCC is clear

13   that, subject to specific exceptions, the parties are free to vary the effect of the

14   UCC by agreement.  *Id.,* 13 Pa.C.S. §1102(c) and (d).  Thus, even if the contract

15   does not constitute a "finance lease," the parties could remain free to agree to

16   terms that would deliver to plaintiff many of the same benefits that plaintiff would

17   enjoy as a matter of law under a "finance lease."

18       Unless the lessor is comfortable that the transaction will qualify as a
         finance lease, the lease agreement should include provisions giving
19       the lessor the benefits created by the subset of rules applicable to the
         transaction that qualifies as a finance lease under this Article.  . . . If
20       a transaction does not qualify as a finance lease, the parties may
         achieve the same result by agreement.
21
22   13 Pa.C.S. §2A103 (Comment (g)) (emphasis added).

23       The UCC also permits a party to disclaim all warranties.  Section 2316

     states,

24
25       **(b) Implied warranties of merchantability and fitness –** Subject to
         subsection (c), to exclude or modify the implied warranty of
26       merchantability or any part of it the language must mention
         merchantability and in case of a writing must be conspicuous, and to
27       exclude or modify any implied warranty of fitness the exclusion must
         be by a writing and conspicuous.  Language to exclude all implied
28       warranties of fitness is sufficient if it states, for example, that "There
         are no warranties which extend beyond the description on the face
         hereof."

11

(c) **Implied warranties in general** – Notwithstanding subsection (b): (1) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the attention of the buyer to the exclusion of the warranties and makes plain that there is no implied warranty.

13 Pa. C.S. §2316(b) and (c).  See also, 13 Pa.C.S. §2A214.[17]  A contract

provision is "conspicuous" when it is written such that "a reasonable person

against whom it is to operate ought to have noticed it."  *Beck-Hummel*, 902 A.2d

at 1274 citing 13 Pa.C.S. §1201.  The court should consider (1) the disclaimer's

placement in the document, (2) the size of the print, and (3) whether the disclaimer

is highlighted by being printed in all capital letters or other different type style.  *Id.*

The express terms of the MLA conspicuously disclaim all warranties.

Paragraph 5 of the MLA reads as follows.

DISCLAIMER OF WARRANTY: LESSEE ACKNOWLEDGES THAT LESSOR HAS NO EXPERTISE OR SPECIAL FAMILIARITY ABOUT OR WITH RESPECT TO THE SYSTEM. LESSEE AGREES THAT THE SYSTEM LEASED HEREUNDER IS LEASED "AS-IS" AND . . . THAT LESSOR HAS MADE NO REPRESENTATION OR WARRANTY WITH RESPECT THERETO, <u>INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.</u>  LESSOR FURTHER DISCLAIMS ANY LIABILITY FOR LOSS, DAMAGE OR INJURY TO LESSEE OR THIRD PARTIES AS A RESULT OF ANY DEFECTS, LATENT OR OTHERWISE, IN THE SYSTEM . . . WITHOUT LIMITING THE FOREGOING, LESSEE HEREBY WAIVES ANY WARRANTIES CONTAINED IN SECTIONS 2A-210, 2A-211, 2A-212 AND 2A-213 OF THE APPLICABLE [UCC] AND ANY RIGHT TO DEEM LESSOR IN DEFAULT PURSUANT THERETO.  LESSEE ALSO AGREES TO WAIVE SUCH WARRANTIES, RIGHTS AND REMEDIES OR OTHER APPLICABLE LAW WITH RESPECT TO THE SYSTEM, INCLUDING ITS FREEDOM FROM PATENT OR COPYRIGHT INFRINGEMENT . . .

Webb Decl., at Ex. 7 (MLA, attached as Ex 4 to Counter Claim, at ¶5)

(underlining added).  This paragraph is titled "DISCLAIMER OF WARRANTY,"

and the title and 3/4 of the paragraph are in capitalized letters such that they stand

---

[17]Plaintiff cites Cal. Comm. Code §10214 (legitimacy of warranty disclaimers).  The section of California's UCC that addresses leases is Article 10.  Pennsylvania denominates this section Division 2A.  Of course Pennsylvania, not California law applies.

12

1   out from other provisions of the contract.  Paragraph 5 also expressly refers to

2   "merchantability" and uses the term "as-is."

3       Additionally, paragraph 2 reads,

4       LESSEE'S OBLIGATION TO MAKE THE PAYMENTS SHALL
        BE <u>ABSOLUTE AND UNCONDITIONAL</u> AND IS NOT SUBJECT
5       TO ANY ABATEMENT, SET-OFF, DEFENSE OR
        COUNTERCLAIM FOR ANY REASON WHATSOEVER,
6       INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR
        FUTURE CLAIMS AGAINST THE LESSOR OR THE PROVIDER
7       OF THE SYSTEM.

8   *Id.*, (underlining added).

9       We RECOMMEND that the District Court find that plaintiff has

10  demonstrated that, even if the MLA is a security agreement (or a sales and security

11  agreement), PMC's claims that it disclaimed all warranties and that MIDC agreed

12  to incur an "absolute and unconditional" obligation to pay PMC regardless of the

13  products' quality or fitness are "probably valid."

14      MIDC can defeat plaintiff's claim only if defendants demonstrate that (1)

15  the MLA and Schedules never became effective because MIDC did not "accept"

16  the goods or (2) that PMC engaged in fraud sufficient to void the contract.[18]

17

18  **3.    Did plaintiff demonstrate the probable validity of its claim that**

19  **MIDC accepted the goods?**

20      Plaintiff claims that MIDC executed a "Delivery and Acceptance

21  Certificate" with respect to the MRI equipment.  *E.g.*, Lynch Motion at 19.  PMC

22

23      [18]Defendants also argue a third alternative -- if MIDC accepted the goods, it effectively
    revoked that acceptance on June 13, 2006.  In our view, plaintiff has demonstrated the probable
24  validity of its claim that, under the express terms of the contract, once MIDC <u>accepted</u> the goods
    it incurred an absolute and unconditional obligation to pay PMC regardless of the condition of
25  the goods.  Therefore, even if MIDC revoked its acceptance of the goods based on their
    condition, as it contends, this revocation might be effective as to the supplier (PMS or Vital
26  Works), but it would <u>not</u> vitiate MIDC's obligation to pay PMC.  Accordingly, we do not
    address the relative merits of this contention at this juncture in our analysis.
27      At the September 20th hearing, defendants' counsel suggested that the Court should not
    enforce PMC's disclaimers as a matter of equity.  However, at this point in the proceedings,
28  defendants have presented neither authority nor evidence that would support a finding that
    defendants are entitled to equitable relief of this nature.

argues that this document constitutes prima facie evidence that MIDC "accepted" the goods.  We note that the evidence includes copies of "Delivery and Acceptance Certificates" for goods delivered under Schedules 2 and 3 but none for goods delivered under Schedules 1 and 4.  Crouse Decl., at Ex. 2-5.  The incomplete state of plaintiff's evidence may not be material, however, because whether defendant signed a particular document is <u>not</u> the central inquiry under Pennsylvania's UCC.

Division 2 of the UCC provides,

(a) General rule -- Acceptance of goods occurs when the buyer:
(1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity;
(2) fails to make an effective rejection (section 2602(a)), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
(3) does any act inconsistent with the ownership of the seller; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

13 Pa.C.S. §2606.

Defendants assert that the Certificates do not support a finding that MIDC accepted the goods because, at the time the Certificates were signed, MIDC had not had a "reasonable opportunity to inspect" the goods as required by UCC §2606.  Among other things, defendants point out that PMS did not deliver all parts for the MRI machine until six months after the first Certificate was signed. Declaration of Dr. Virgil L. Williams in Support of . . . Opposition to Application for Right to Attach Order and for Writ of Possession, filed August 30, 2006, ("Williams Decl.") at ¶¶28 and 30.  Moreover, defendants argue that plaintiff and PMS "pressured," "tricked," and "coerced" MIDC to sign the Acceptance Certificates before it had a reasonable opportunity to inspect the equipment.  *Id.*, at ¶¶28, 29, and 34.[19]

---

[19]Defendants also contend that the November 23th Certificate was signed by someone not authorized to do so and that MIDC notified PMC on November 30, 2004, that that Certificate was unauthorized and not legally binding.  Williams Decl., at ¶29.

1    For purposes of these writ applications we adopt defendants' premise that

2  MIDC could not have "accepted" the goods until after such time as the MRI

3  machine was complete.  Defendants have submitted evidence that would support a

4  finding that the final equipment for the MRI machine was delivered in May 2005.

5  Williams Decl., at ¶¶28-30.  Accordingly, we must determine whether the

6  evidence supports a finding that plaintiff will "probably" be able to show that

7  MIDC had a reasonable opportunity to inspect the goods  after May 2005 and that

8  MIDC in fact accepted the MRI machine.

9    What constitutes a "reasonable" opportunity to inspect the goods is a factual

10  inquiry.  *E.g.*, 13 Pa.C.S. §1204 ("reasonable time . . . depends on the nature,

11  purpose and circumstances of [the action to be taken]").  Defendants argue that the

12  MRI equipment is complex and that that fact supports a conclusion that they

13  needed a lengthy inspection period.  Opposition, at 13-16.[20]

14    MIDC became "operational" sometime in 2005.  Williams Decl., at ¶2.  Dr.

15  Williams states that MIDC operated without the MRI machine for the first six to

16  nine months.  *Id.*, at ¶33.  He also states that PMS tried to cure defects in the goods

17  for more than 1 ½ years before MIDC rejected the goods or revoked the

18  acceptances.  Williams Decl., ¶¶32 and 39.  He further states that the machine

19  needed certain routine maintenance 3-4 times in less than twelve months.  *Id.*, ¶31.

20  Based on Dr. Williams' testimony, we infer that MIDC has been using the

21  machine on patients for at least one year, perhaps more.  MIDC did not formally

22  try to reject the goods until June 13, 2006, more than one year after the final

23  equipment was delivered.  Furthermore, during those thirteen months, MIDC used

24

25    [20]Citing *Ford Motor Credit Co., v. Caiazzo*, 564 A.2d 931 (Pa. Super. 1989), defendants
argue that it is too early in this litigation to assess whether defendant rejected or revoked
acceptance of the goods within a reasonable time.  Transcript, September 20, 2006, hearing.  As

26  the court stated on the record, we realize that we are somewhat disabled by the underdeveloped
state of the evidence.  However, we are charged with assessing the relative merits of the parties'

27  positions at an early juncture in the proceedings and must do so to the best of our ability.  We
also remind defendants that our preliminary assessment of the merits of this dispute will play no

28  role in the adjudicative process that will inform a final judgment.  Therefore, defendants suffer
no unfair prejudice as a result of these early assessments.  See, n. 6.

(and apparently continues to use) the MRI equipment on patients to generate revenue.  Opposition at 2:11-12.

Although there is no strict time limit for what constitutes a reasonable period to inspect and accept or reject delivered goods, we find it unlikely at best that a commercial party would be granted <u>thirteen</u> months (May 2005 - June 13, 2006) in which to inspect expensive machinery and/or would be permitted to continue to routinely use that machinery in its business for thirteen months before rejecting it as nonconforming.  The subject MRI equipment is the center of defendants' business and, as they state, the economic survival of their business depended on it.  Webb Decl., at Ex. 4 (Declaration of Nicholas K. Garvey in Support of Opposition to Plaintiff's Application for Right to Attach Order and Application for Writ of Possession, at ¶3).  Defendants have asserted that the equipment has two principal defects.  One is that it has never been able to complete an MRI examination as fast as defendants were led to believe it would.  The second is that the equipment fails to deliver "cardiac gating" and "other vascular imaging" that purportedly would have rendered clearer images than standard MRI machines by taking images between the patient's heartbeats.  Williams Decl., at ¶¶17 and 32.  Defendants contend that they relied on representations about the speed of the equipment and its ability to produce clear vascular images when they formed their business plan and identified a viable market niche.

There are two difficulties with these contentions.  One arises from the fact that defendants' business remains in operation today – with the subject equipment as its critical component.   If the defects really are so financially disabling, how is it that the business continues to operate?   The second difficulty is more directly on point here:  the two alleged defects about which defendants now complain clearly would have surfaced in the earliest period of use of the equipment.  Its alleged lack of speed would have been obvious from first use.  And if the image

clarity really was so central to defendants' business plan, one would expect defendants to have run tests or otherwise to have encountered this problem very soon after their business became operational.  Given the visibility of the two principal alleged defects, it clearly could not be deemed reasonable to take thirteen months to complete an inspection that would uncover them.

Defendants seek to counter this line of argument by contending that their acceptance of the goods was always conditional on assurances from plaintiff that the defects were curable and would be cured promptly (a prompt cure allegedly being essential to the survival of the business).  It is not clear, from the evidence before the court at this early juncture, that plaintiff ever acknowledged these alleged defects or ever assured defendants that the defects would be cured.  What is clear, however, is that thirteen months cannot be deemed "prompt."  Defendants contend that efforts were made repeatedly to correct these problems with the equipment – but that, to this day, the problems remain.  As we have noted, defendants also contend that these particular problems gut their business plan and pose severe threats to the survival of their operations.

The legal question at this juncture is this: in these circumstances, was it "reasonable" to take thirteen months to "inspect" this equipment for these alleged defects?  Even assuming that the law would extend the period for completing an "inspection" to include time to try to correct identified defects, we think it substantially more likely than not that the fully litigated answer to this question will be "no."  Even for sophisticated goods like these, for defects that are so obvious and that allegedly pose such grave threats to the viability of the undertaking, why would reasonable people operating this business take more than a few months to complete their "inspection" (by observing the plaintiff's alleged repeatedly unsuccessful efforts to correct the problems)?  Defendants have proffered no persuasive answer.  Instead, we think it is appreciably more likely

17

that the court will find that by keeping the equipment for so long and by continuing to operate the business around it (even now), defendants "accepted" it.

We also find it relevant that defendants' attempted rejection of the goods (or revocation of acceptance) did not occur until two months after plaintiff filed the complaint in this action. If PMC and/or PMS had "coerced" MIDC into accepting the goods we think the notion of rejection or revocation would have arisen before thirteen months had passed and before plaintiff was compelled to file a complaint to collect the debt.[21] Defendants are sophisticated commercial players, and it appears that they had access to legal advice during this time.[22] In our view, reasonably sophisticated commercial players who truly felt that they had been "tricked" and "pressured" into accepting goods that were defective and that were critical to their business would have made inquiries into their legal rights before thirteen months had passed.

The evidence demonstrates the probable validity of plaintiff's claim that MIDC had a reasonable amount of time to inspect the goods following delivery of the final equipment in May 2005 and did not make an effective rejection.

---

[21]We also question the contention that PMC "forced" MIDC to accept the goods because evidence in the record suggests that MIDC was under less economic pressure than MIDC suggests. First, MIDC was not yet operational when the first equipment was delivered, so MIDC would not have had to turn away patients if it returned the goods and sought a machine from a new provider. Williams Decl., at ¶28. Second, Dr. Williams indicates that MIDC had a pre-established relationship with another company that could provide medical equipment, "GE." If MIDC was unhappy with PMS and/or PMC, it could have fallen back on its relationship with GE for new equipment. In fact, Dr. Williams indicates that MIDC looked to GE for equipment midway through its pre-acquisition interaction with PMS. Williams Decl., at ¶¶3 and 10.

We acknowledge that evidence submitted by defendants indicates that MIDC's office space may have been designed and constructed specifically to accommodate this MRI machine and that "construction was nearly completed" in October 2004 before delivery of the equipment. Williams Decl., at ¶¶18 and 30. Defendants do not state that this customized construction would prevent MIDC from installing other MRI machinery. Based on the evidence, it appears that PMS and MIDC intended MIDC to be a "show" site, so PMS had input into the interior design of the office space in order to showcase its product. Id. Therefore, it is unclear whether the customized construction was a matter of aesthetics, function, or both.

[22]At the September 20th hearing, defendants' counsel indicated that MIDC had a relationship with the law firm of Lanahan & Reilley during this period. Transcript of September 20, 2006, hearing.

18

1    We also conclude that plaintiff is likely to establish that defendant

2    "accepted" the equipment on the independent ground that MIDC has acted in a

3    manner "inconsistent with the ownership of the seller" (regardless of whether the

4    seller is PMC or PMS). 13 Pa. C.S. §2606(a)(3).[23]  Despite MIDC's alleged

5    dissatisfaction with the goods, MIDC has continued to use the MRI equipment.

6    MIDC continued to use the equipment after being contacted by plaintiff's

7    collection department, after plaintiff filed this complaint, and, in fact, MIDC

8    continues to use the MRI machine with patients to this day even though it

9    contends that it has rejected or revoked acceptance of the goods.  Opposition at

10   2:11-12; Webb Decl., at Ex. 4 (Garvey Decl.).  MIDC's continued use of the MRI

11   machine is inconsistent with the seller's ownership rights.  If MIDC "rejected" the

12   goods it was under a duty to reasonably preserve the goods until the seller could

13   arrange to retake them.  13 Pa.C.S. §2602.

14   There is an additional reason for rejecting defendants' contention that

15   MIDC never "accepted" the goods because PMS continued to try to cure the

16   alleged defects.  This contention speaks to the issue of "revocation," not

17   acceptance.  The UCC states,

18   [a]cceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be

19   revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but

20   acceptance does not of itself impair any other remedy provided by this division for nonconformity.

21   13 Pa.C.S. §2607(b) (emphasis added).

22   But whether MIDC effectively revoked acceptance of the goods based on

23   PMS's failure to seasonably cure the defects is irrelevant to the question before us.

24   The express terms of the parties' contract provide that any defects and/or problems

25   with the fitness of the goods are the responsibility of the provider (PMS) and no

26   such problems relieve MIDC of its obligation to pay plaintiff (PMC) once MIDC

27

28   [23]See also, 13 Pa. C.S. §2602 ("after rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller").

19

accepts the goods.[24]  Because the express terms of the MLA prevent MIDC from revoking its obligation <u>to pay plaintiff</u> once the goods are accepted, we do not address the efficacy of defendant's effort to revoke at this juncture in our analysis.

We RECOMMEND that the District Court find that plaintiff has shown the probable validity of its claim that MIDC "accepted" the MRI equipment and that MIDC did so with knowledge of the equipment's nonconformity.

We have concluded that plaintiff has established the "probable validity" of its claim that the parties agreed to terms that include (1) express disclaimers of warranties by plaintiff, (2) an absolute and unconditional obligation to pay plaintiff by MIDC, (3) an agreement from MIDC that any recourse it has for defects or quality will be pursued against the provider (PMS or Vital Works) only, and that plaintiff has demonstrated the probable validity of its claim that MIDC "accepted" the goods with knowledge that they were nonconforming.[25]  If the District Court adopts these recommendations, plaintiff will have established the "probable validity" of its claim against MIDC <u>unless MIDC shows that it is likely to prove that fraud by PMC voids the contract.</u>

**4.    <u>Is MIDC likely to prove fraud?</u>**

Defendants claim that plaintiff cannot enforce the MLA and Schedules 1-4 because PMC and PMS procured the contract by fraud.  According to defendants, PMC and PMS fraudulently represented to MIDC that PMC and PMS were one company so that MIDC would not ascribe any significance to the language in the

---

[24]Where a buyer accepts goods with knowledge of their nonconformity, the buyer is responsible for the purchase price regardless of whether the buyer is entitled to damages for the nonconformity.   13 Pa.C.S. §2607(b) (acceptance does not impair any other remedy for nonconformity); *Beaver Valley Alloy Foundry, Co., v. Therma-Fab, Inc.*, 814 A.2d 217, 220 (Pa. Super. 2002).

[25]Defendants argue that plaintiff's evidence is not competent.  Opposition at 21-22. However, at this juncture we have relied only on the express terms of the contract and <u>MIDC's</u> evidence (*i.e.*, Dr. Williams' Declaration).  As far as we can tell, defendants do not contend that the contract is a fake or dispute the validity of Dr. Williams' testimony.

MLA and the Schedules that made MIDC's obligation to pay PMC absolute once MIDC accepted the equipment.  Defendants further allege that as part of the alleged conspiracy to defraud MIDC, PMS and PMC agreed that PMS (the provider) would deliver no warranties to PMC – so PMC would have no warranties to pass through to MIDC.  Thus, the purpose of this alleged scheme was to leave MIDC with recourse to no one for defective equipment: once MIDC accepted the equipment, its obligations to PMC would be unconditional, and the absence of warranties would leave PMS fully protected from any claims MIDC might try to assert against it.

Defendants also allege that PMC and PMS sold MIDC equipment they knew would not perform as represented.  They purportedly further conspired to deliver only part of the equipment for six months in order to conceal that the equipment would not meet MIDC's needs and to "pressure," "coerce," and "trick" MIDC to accept the incomplete equipment before it reasonably could inspect it.  According to defendants, PMC and PMS thereby saddled MIDC with defective equipment and no legal recourse.  This is an engaging set of allegations.  The question at this juncture, however, is how likely is it that defendants will be able to prove a counterclaim sounding in fraud that would void MIDC's otherwise apparently unconditional obligation to PMC?

The elements of a claim for fraudulent misrepresentation in Pennsylvania are (1) a representation (2) which is material to the transaction at hand (3) made falsely, with knowledge of its falsity or with recklessness as to whether it was true or false, (4) with intent to mislead another into relying on it, (5) justifiable reliance on the misrepresentation, and (6) resulting injury.[26]

Defendants allege that PMC and/or PMS made two kinds of misrepresentations.  As stated, they allege that PMC and PMS represented that they were one entity.  In addition, defendants allege that PM*S* misrepresented the

---

[26]*E.g., Boyd v. Rockwood Area School Dist.,* 2006 WL 2612795 (Pa. Cmwlth).

quality/fitness of the MRI machine.  Defendants have submitted no evidence that anyone from <u>PMC</u> made any representations about the <u>quality</u> or <u>fitness</u> of the MRI machine.  Defendants also have not set forth legal authority for imputing representations made by PMS to PMC.  Because defendants have failed to set forth a basis for finding <u>PMC</u> (plaintiff) responsible for "quality" representations, defendants must demonstrate the probable validity of their fraud claim based on the allegation that PMC and PMS misrepresented that they were "affiliates."

For reasons we explain below, we RECOMMEND that the District Court find that defendants have failed to demonstrate the probable validity of their claim that PMC may not enforce the MLA because the contract was procured by fraud.

Defendants have presented some evidence that agents of PMC and agents of PMS made representations that implied that the companies were affiliated. Plaintiff objects that much of this evidence is inadmissable hearsay.  Plaintiff's Evidentiary Objections to Declaration of Virgil Williams, filed September 6, 2006. We need not reach plaintiff's evidentiary objection, however, because even if we conclude that defendants could prove that such misrepresentations were made, defendants have not satisfied us that they are likely to be able to establish that any such representations were material or that defendants justifiably relied on them.

### (a)    <u>Materiality</u>

It is true that one purpose of the protections offered by a true "finance lease" is to "substitute the supplier of the goods for the lessor as the party responsible with respect to warranties and the like."  13 Pa.C.S. §2A101 (Comment).  This is desirable where the lessor is not in the business of selling the goods at issue and so would have no basis for knowing anything about the quality of the goods. Protecting lessors from defect/warranty claims encourages them to finance these purchases and "greases the wheels of commerce."  There might be circumstances in which the lessor and provider are so closely connected that the lessor *should* be

responsible for "quality" warranties.  However, it appears that Pennsylvania's legislature did not find it necessary to create any special rule(s) for finance leases involving affiliates.  "No attempt was made to fashion a special rule where the finance lessor is an affiliate of the supplier of goods; this is to be developed by the courts, case by case."  13 Pa.C.S. §2A101 (Comment).  Pennsylvania's legislature apparently did not believe that there was <u>inherent</u> danger where affiliated companies perform the separate functions of supplier and lender.  This undercuts a suggestion that an affiliation between such companies is <u>inherently</u> material.

In addition, at least some courts have rejected the notion that either a real or perceived joint enterprise between the lessor and the supplier is material to determining the effect of a contract that functions as a finance lease.  Those courts have upheld disclaimers by the lessor of warranties such as those found in the MLA.  *Citicorp Leasing, Inc., v. Kusher Family Ltd. Partnership*, 2006 WL 1982757, *6 (S.D.NY 2006) (assuming a joint venture exists, it would not circumvent express provisions of contract); *DeLage*, 88 A.2d 895 (faulty perception that provider and lessor are the same entity does not contravene express terms of contract).  These cases, together with the UCC Comment, suggest that the mere fact that the supplier and lessor may be affiliates is not necessarily material to the transaction.

"A misrepresentation is material if it is of such character that if it had not been misrepresented, the transaction would not have been consummated." *Colaizzi v. Beck*, 895 A.2d 36 (Pa.Super. 2006).  Defendants contend that MIDC would not have agreed to the MLA's terms if it had known that PMC and PMS were legally separate companies.  However, Dr. Williams' declaration suggests otherwise.  Dr. Williams, MIDC's president and CEO, states that PMS originally provided the names of <u>two</u> "finance companies" -- one was an "outside" company named DVI and the other was PMC, which Dr. Williams believed was an "in-house" company.  Williams Decl., at ¶7.  <u>MIDC originally chose to use DVI, the</u>

23

1    *outside* company.  Williams Decl., at ¶8.[27]  MIDC's original choice strongly

2    suggests that MIDC did not truly care whether the finance company was in-house

3    or outside.  Dr. Williams later states that when MIDC finally decided to purchase

4    the goods, it "indicated a desire to finance the acquisition of the machine through

5    [PMS]."  Williams Decl., at ¶19.  But Dr. Williams does not say anything about

6    who MIDC wanted to finance the machine through the "in-house" company.[28]

7    There is no evidence that the fact that MIDC believed PMC to be in-house was

8    actually important to MIDC (other than an after-the-fact self-serving conclusory

9    statement to that effect).

10        In the same vein, Schedule 1 appears to involve a supplier (Vital Works)

11   that is completely unrelated to PMC.[29]  As to Schedule 1, MIDC clearly could see

12   that the supplier and finance company were not affiliates, yet MIDC signed

13   Schedule 1 and agreed to its terms.[30]  This further undermines the contention that

14   it was important to MIDC that the supplier and finance company constitute one

15   entity.

16        Finally, the terms of the MLA to which MIDC agreed undermine the notion

17   that PMC and PMS' affiliation, or lack thereof, was material to defendants.  Non-

18   affiliation would be material only if it gave PMC some greater protection than

19   MIDC wanted PMC to have.  However, the MLA expressly and clearly disclaims

20   all warranties by PMC and states that MIDC's obligation to pay PMC is absolute

21   and unconditional regardless of defects in the goods.  Therefore, even if PMC and

22

23        [27]DVI later became insolvent, and MIDC lost its deposit with DVI.  *Id.*

24        [28]The so-called choice could have been nothing more than that PMS presented MIDC
     with two options, and when one (DVI) was gone MIDC went with the remaining company.
25

26        [29]We say "appears" because the parties have presented no evidence about Vital Works,
     but suggest that Vital Works is an unrelated entity.

27        [30]Defendants argue that their fraud claim vitiates MIDC's obligation to pay PMC any of
     the money owed under the MLA.  MIDC does not explain, however, how this claim saves MIDC
28   from its obligation to pay for property supplied by Vital Works under Schedule 1, a company
     apparently unrelated to PMC and uninvolved in the alleged fraud.

PMS were "affiliated" as MIDC thought, MIDC agreed to the <u>same</u> terms that would protect an <u>un</u>affiliated finance company in a true "finance lease." Defendants have not identified any terms that would attach where the lender is <u>un</u>related to the supplier and that are <u>more</u> onerous than the <u>express</u> terms to which MIDC freely and knowingly agreed. In the real world, the 'surprising' news that PMC and PMS are separate entities does not appear to provide PMC with any significant protections beyond those to which MIDC expressly agreed to be bound. This fact undermines the materiality element.

We also note that there is evidence that PMC does not sell any goods and has no reason to have any specialized knowledge about the MRI machine. Crouse Decl., at ¶34. This evidence supports an inference that this is not the kind of case in which the lender might be charged with knowledge about the product's fitness and would unfairly[31] avoid warranties if the court enforces the lease as written.

### (b)   <u>Justifiable Reliance</u>

MIDC also has not shown that it will probably prevail on its claim that it justifiably relied on the alleged "affiliate" misrepresentations.

Provisions in the MLA would lead a reasonable person to question the alleged misrepresentations. Paragraph 17 states,

> Lessee acknowledges and agrees that Lessee, in executing this Agreement and each Lease hereunder, it [sic] has relied <u>solely upon the terms, provisions and conditions contained herein and therein</u>, and <u>any</u> other statements, warranties, or representations, if any, by the <u>Provider</u>, or any salesperson, employee, representative or agent of the Provider, <u>have not been relied upon.</u>

Webb Decl., at Ex. 7 (MLA, attached as Exhibit 4 to Counter Claim) (emphasis added). Moreover, paragraph 21 -- the last paragraph before the signature lines -- states, in all capital letters,

---

[31]Recall that even a true seller can disclaim warranties if done expressly and conspicuously.

LESSEE ACKNOWLEDGES THAT NO PROVIDER NOR ANY SALESPERSON, EMPLOYEE, REPRESENTATIVE OR AGENT OF A PROVIDER IS AN AGENT OR REPRESENTATIVE OF LESSOR, AND THAT NONE OF THE ABOVE IS AUTHORIZED TO WAIVE OR ALTER ANY TERM, PROVISION OR CONDITION OF THIS AGREEMENT OR ANY LEASE, OR MAKE ANY REPRESENTATION WITH RESPECT TO THIS AGREEMENT, ANY LEASE OR THE SYSTEM ON BEHALF OF LESSOR.

*Id.*, (emphasis added). Because the terms of the contract expressly indicate that PMC and PMS are separate entities and that MIDC should not rely on any representations not contained in the contract, MIDC's reliance may not be reasonable.

Furthermore, because the express terms of the contract provide protections from warranty claims <u>as extensive</u> as those that would have been provided to an <u>un</u>affiliated finance company under a true finance lease, MIDC has not shown that it was justified in concluding that it was obtaining any benefit [*e.g.,* greater recourse for warranties] by using an in-house finance company.

For all the reasons stated above, we RECOMMEND that the District Court find that plaintiff has demonstrated the probable validity of its claim that MIDC is obligated to pay PMC the amount owed under the MLA and Schedules 1-4. Therefore, plaintiff has established its entitlement to a writ of attachment as to <u>MIDC</u>. We now turn to the merits of its claims against the individual defendants.

## 5.    **Claims against individual defendants**

Plaintiff has established the probable validity of its claim to enforce the MLA. However, the individual defendants are not liable pursuant to the MLA and Schedules 1-4. The individual defendants each signed a "Guaranty" agreement that purports to obligate that defendant to guarantee MIDC's obligation under the MLA up to $450,000.00 plus expenses. Crouse Decl., at Ex. 8-10. Although each defendant signed a separate agreement, plaintiff does not dispute that the

1    guarantors[32] agreed to be jointly and severally liable for the <u>aggregate</u> guaranty

2    amount of $450,000.00 plus expenses, including attorneys' fees.  *Id*.  In order to

3    obtain a writ of attachment against each of the individual defendants, plaintiff

4    must establish the probable validity of its claim to enforce the Guaranties.

5         Defendants argue that plaintiff is not entitled to writs of attachment against

6    the guarantors for three reasons: (1) the Guaranties were obtained based on false

7    representations and therefore should be discharged, (2) plaintiff has not set forth

8    specific evidence about any demands for payment it made to the guarantors, and

9    (3) plaintiff has not established that plaintiff's claim relates to the individual

10   defendants' "trade, business or profession."

11        The guarantors claim that plaintiff fraudulently induced them to sign the

12   guaranties and that they would not have signed the Guaranties if they had known

13   (1) the truth about the quality of the equipment and (2) that they were contracting

14   with a financial institution.  Williams Decl., at ¶¶43-45; Webb Decl., at Ex. 1

15   (Gronner Decl., at ¶¶4-80) and Ex. 3 (Lynch Decl., at ¶¶5-9).  They argue that

16   their obligations under the guaranties, therefore, should be discharged.  Opposition

17   at 19.[33]  As previously stated, defendants have presented no evidence that PM*C*'s

18   agents made representations about the "quality" of the goods, and defendants

19   present no basis for imputing statements about "quality" made by PMS's agents to

20

21        [32]It appears that Pennsylvania distinguishes between "sureties" and "guarantors" and that
22   the individual defendants may be more aptly termed "sureties."  *McIntyre Square Assoc., v.
     Evans*, 827 A.2d 446, n.7 (Pa. Super. 2003) (a creditor may look to a surety for immediate
23   payment without first attempting to collect from the principal debtor, but the creditor must seek
     payment from the principal before pursuing a guarantor). See also, Crouse Decl., at Ex. 8, 9, and
24   10 (Section 3: "guarantor" waives right to require PMC to proceed against MIDC first).  It is
     premature and unnecessary to rule on this issue at this juncture, so we use the term "guarantor"
     to maintain consistency with the parties' papers.
25        Pennsylvania also distinguishes between "gratuitous (uncompensated) sureties and
     sureties who are compensated."  *J.F. Walker Co., Inc., v. Excaliber Oil Group, Inc.*, 792 A.2d
26   1269 (Pa. Super. 2002).  At least in some circumstances, this distinction can affect the surety's
     ability to obtain discharge.  *Id*.  The record before us does not permit us to make a finding as to
27   whether defendants are gratuitous or compensated sureties.

28        [33]In support of this argument defendants cite California law.  As stated at the outset, the
     parties agree that Pennsylvania law applies to the parties' contract disputes.

PMC.  Accordingly, we fail to see how these representations can be the basis for vitiating defendants' contract with PM*C*.

Defendants' contention that they would not have agreed to guarantee MIDC's obligation (up to $450,000.00 plus expenses) had they known that PMC was an independent entity and a financial institution fails essentially for the same reasons stated in section 4 *supra*.  Defendants state, "I eventually became a guarantor under far more onerous terms than those to which I agreed to act as creditor [sic], or to which I would have ever agreed."  Williams Decl., at ¶45; Lynch Decl., at ¶9; Gronner Decl., at ¶8.  However, the so-called onerous terms to which defendants are bound are completely spelled out in the MLA, Schedules 1-4 and the Guaranty.[34]  Defendants have not demonstrated that the onerous terms that attach to a contract involving an <u>un</u>related lessor and supplier are <u>more</u> onerous than the <u>express</u> terms to which the defendants all agreed.  Given the full expression of terms in the MLA, Schedules and Guaranty, and because defendants have not identified new "hidden" terms that unexpectedly arose when it was revealed that PMC was a legally separate entity from PMS, we find that the guarantors' statements that they committed themselves to more onerous terms than they expected are inconsistent with the realities of the transaction.  Therefore, defendants have not demonstrated that they are likely to prove that they would not have signed the Guaranties if they had known PMC's true status.  It follows that they have not demonstrated the probable validity of their claim for discharge.

The guarantors also seem to argue that plaintiff has not established that it "demanded" payment from the guarantors.  Opposition at 25.  The Guaranties indicate that defendants have waived any precondition that PMC demand payment.

---

[34]The Guaranty document expressly states that the obligations of the guarantor are "absolute and unconditional, irrespective of any circumstances which might constitute a legal or equitable defense or discharge of its obligations hereunder or which otherwise limit enforceability against the Guarantor by Lessor."  Crouse Decl., at Ex. 8-10 (Guaranty at §2).  The document further states, "Guarantor hereby covenants that by its agreement under this Guaranty it shall <u>not be discharged</u> from its obligations hereunder or under the Lease <u>except by payment in full of all amounts due</u>."  *Id*., at Ex. 8-10 (Guaranty at §3) (emphasis added).

1  Crouse Decl., at Ex. 8-10 (Guaranty at §3) ("Guarantor hereby waives against

2  Lessor as a precondition for payment hereunder each of the following: any

3  demand for payment, . . .").  Moreover, PMC's agent, Mr. Crouse, states generally

4  that demands <u>were</u> made, and none of the individual defendants denies receiving

5  such a demand.  Crouse Decl., at ¶30.

6      Finally, in order to attach property of a "natural person" the plaintiff's claim

7  must arise out of the individual's "trade, business, or profession" as opposed to his

8  personal, family or household use.  Cal. C.C.P. §483.010(c).  Defendants assert

9  that plaintiff has not established this requirement.  We doubt that defendants

10 seriously contend that they guaranteed a portion of the acquisition price of MRI

11 equipment for their personal use.  None of the guarantors asserts in his declaration

12 that he did so.  All three defendants are shareholders in MIDC, and Dr. Williams

13 and Dr. Gronner are physicians in MIDC's practice.  Absent <u>evidence</u> to the

14 contrary, it is our view that MIDC's operations clearly constitute "business," that

15 the MRI equipment was used and intended to be used only in that business, and

16 that the Guaranties were sought and given only in connection therewith.  *Pos-A-*

17 *Traction, Inc., v. Kelly-Springfield Tire Co.*, 112 F.Supp.2d 1178 (C.D. Cal 2000)

18 (claim relates to business if is part and parcel of activity which is for purpose of

19 livelihood or profit on a continuing basis).

20

21     For all the reasons set forth in the preceding pages, we RECOMMEND that

22 the District Court find that plaintiff has demonstrated the probable validity of its

23 claims against the guarantors.

24

25          **6.    <u>Secured Amounts, Exemptions and Undertakings</u>**

26     We RECOMMEND that the District Court find that plaintiff is entitled to

27 writs of attachment against each of the defendants.  We must next determine the

28 amount to be secured by each writ, the validity of defendants' claimed exemptions

and whether and to what extent plaintiff must post an undertaking.  Cal. C.C.P. §§484.090, 489.210 and 489.220.

### (a)   Amounts to be secured

Plaintiff may secure the amount of defendants' indebtedness less certain sums that do not appear to apply here.  Cal. C.C.P. §483.015.  The Court also may include in the amount to be secured by the attachment estimated costs and allowable attorney's fees.  Cal. C.C.P. §482.110.

Plaintiff's application for writ of attachment against MIDC identifies the amount to be secured from MIDC as "$2,535,726.04, which includes estimated costs of $500.00 and estimated attorney fees of $27,427.98."  Mr. Crouse states that the unpaid balance of Schedules 1-4 is $2,882,798.06.  Crouse Decl., at ¶23.  Plaintiff clarified on the record that the amount owed under the contract is $2,882,798.06 and that the sum sought in the writ application was reduced (by $375,000.00) to reflect the estimated value of the MRI equipment.  Transcript of September 20, 2006, hearing.  Plaintiff reduced the sum sought on the assumption that the Court would grant plaintiff's application for writ of possession.  *Id*.  A writ of attachment for the reduced amount, together with possession of the equipment, would fully secure defendants' alleged obligation.  Although we recommend below that the District Court permit MIDC to retain possession of the goods, we also recommend below that MIDC post an undertaking in the amount $375,000.00 in order to do so.  That undertaking will secure plaintiff's interest in the current value of the goods.  Therefore, for purposes of the writ of attachment we recommend that the Court permit plaintiff to attach property of MIDC's valued at $2,507,798.06, plus the amount of allowed fees and costs, if any.[35]

---

[35]Plaintiff also asserts that it is entitled to (1) unknown taxes, fees, and liens, (2) unknown late fees, and (3) unknown interest.  *E.g.*, Lynch Motion at 12.  As we understand it, plaintiff does not seek to add these items to the secured amount at this time.  Because plaintiff gives no basis for valuing these items, we would not recommend increasing the amount secured by the

1    Plaintiff's applications for writs of attachment against the guarantors state

2  that the amount to be secured is "$457,350.00 which includes estimated costs of

3  $500.00 and estimated attorneys' fees of $6,850.00." Lynch Motion at 8; Williams

4  Motion at 8; Gronner Motion at 9. The record thus far made supports an inference

5  that the individual defendants have guaranteed $450,000.00, plus expenses, and

6  that the guarantors are jointly and severally liable for that amount. Therefore, we

7  recommend that the District Court issue writs of attachment against the individual

8  defendants in the amount $450,000.00, plus allowable expenses, if any. Because

9  defendants are jointly and severally liable, plaintiff appears to be entitled to writs

10  of attachment in the full securable amounts as to each of the defendants.

11  However, once plaintiff has attached sufficient property to secure defendants'

12  obligation, plaintiff may not continue to attach property that would unreasonably

13  exceed the value of the obligation.[36]

14    In addition to the principal amounts owed under the relevant contracts,

15  plaintiff seeks to secure amounts incurred for costs and attorneys' fees. It is

16  within the court's discretion to include in the amount to be secured by the

17  attachment the estimated costs and allowable attorneys' fees. Cal. C.C.P.

18  §§482.110 and 483.015. However, plaintiff has failed to adequately support this

19  request. Plaintiff has proffered no evidence to support its claims for costs or fees.

20  At the hearing on September 20, 2006, plaintiff's counsel indicated that the fee

21  request reflects a flat rate amount generated by his law firm for different types of

22  collection cases. The fees do not reflect actual hours spent. Transcript, September

23  20, 2006, hearing. Moreover, it is unclear whether the fees reflect the fact that

24  much of the work completed for the four writ applications is redundant. Similarly,

25  plaintiff has not submitted evidence in support of the charges labeled "costs."

26

27  writ to reflect these items.

28    [36]Accord, Cal. C.C.P. §488.720 (defendant may obtain order releasing attachment to the
extent the attachment is excessive).

In our view the fees that plaintiff is entitled to secure via writ of attachment are only those relating to obtaining the writ(s) (as opposed to those spent on the litigation generally).  The documents in the record before us would support a finding that plaintiff is entitled to attorneys' fees in the <u>total</u> amount $10,000.00 (*i.e.,* for work on all four applications).  Because the bulk of the legal work was required to obtain the writ against MIDC and because very little additional work was necessary to obtain writs against the individuals, we RECOMMEND that the District Court allocate the majority of these fees to MIDC.

We RECOMMEND that the District Court grant plaintiff's request for a writ of attachment against MIDC in the amount $2,507,798.06, which represents the balance due under the contracts minus the current value of the goods (which will be secured separately) plus $7,000.00 for attorneys' fees.

We RECOMMEND that the District Court grant plaintiff's request for a writ of attachment against each of the individual defendants in the amount $450,000.00 for the balance due under the Guaranties plus $3,000.00 for attorneys' fees.

### (b)    Property sought to be attached and claimed exemptions

Plaintiff's applications for writs of attachment must identify the property that plaintiff currently seeks to attach.  Cal. C.C.P. §484.090(e).  Additionally, defendants are permitted to claim that certain property is exempt from attachment.[37]  Cal. C.C.P. §484.350.  If the District Court adopts our recommendation that it grant plaintiff's applications for writs of attachment, then the Court's order must set forth the extent of all exemptions to which defendants are entitled.  Cal. C.C.P. §484.090(c).

---

[37]California procedure permits defendants to file all claims for exemption even if plaintiff is not currently trying to attach the property that is the subject of the exemption.

1    MIDC is a corporation and has asserted no exemptions.  "All corporate

2    property for which a method of levy is provided by Article 2 [Cal. C.C.P.

3    §488.300 et seq.]" is subject to attachment.  Cal. C.C.P. §487.010.  Plaintiff also

4    seeks a writ directing the levying officer to take possession of "documentary

5    evidence in Defendant's possession of title to property and documentary evidence

6    in Defendant's possession of debt owed to Defendant."  MIDC Motion at 7.

7    Accordingly, if the District Court adopts our recommendation to grant plaintiff's

8    application for writ of attachment as to MIDC, we RECOMMEND that the

9    District Court's order authorize plaintiff to attach all property described in

10   California C.C.P. §487.010 and order MIDC to turn over documentary evidence in

11   MIDC's possession or control of title to property and documentary evidence in

12   MIDC's possession or control of debt owed to MIDC.

13   In order to obtain a writ of attachment against a "natural person," plaintiff's

14   identification of the property to be attached "shall be reasonably adequate to

15   permit the defendant to identify the specific property sought to be attached."  Cal.

16   C.C.P. §484.020(e).  For each natural person defendant plaintiff seeks to attach

17   and identifies real property located in California by address and description.  Cal.

18   C.C.P. §487.010(c)(1).  This property is adequately described.  See, Lynch

19   Motion, Gronner Motion, and Williams Motion, each containing address and lot

20   description of real property for which attachment is sought.

21   In addition to real property, plaintiff seeks to attach money to the extent

22   authorized by Cal. C.C.P. §487.010.  *E.g.*, Lynch Motion at 8.  Section

23   487.010(c)(7) of California's Code of Civil Procedure permits attachment of

24   > Money on the premises where a trade, business, or profession is
25   > conducted by the defendant and except for the first one thousand
     > dollars ($1,000), money located elsewhere than on such premises and
     > deposit accounts, but if the defendant has more than one deposit
26   > account or has at least one deposit account and money located
     > elsewhere than on the premises where a trade, business, or profession
27   > is conducted by the defendant, the court, upon application of the
     > plaintiff, may order that the writ of attachment be levied so that an
28   > aggregate amount of one thousand dollars ($1,000) in the form of
     > such money and in such accounts remains free of levy.

33

As we read the statute, plaintiff is entitled to attach:

> (1)   money on the premises where a trade, business, or profession is conducted by the defendant, **AND**
>
> (2)   (a)   money located elsewhere than on such premises and deposit accounts in excess of the first one thousand dollars ($1,000.00), **OR**
>
> <u>if the defendant has</u> (i) more than one deposit account or (ii) at least one deposit account and money located elsewhere than on the premises where a trade, business, or profession is conducted by the defendant, then
>
> (b)   money in deposit accounts and elsewhere than on the premises where a trade business, or profession is conducted in excess of an aggregate amount of one thousand dollars ($1,000.00).[38]

As with MIDC, plaintiff also seeks an order that the levying officer take "possession of . . . documentary evidence in Defendant's possession of title to property and documentary evidence in Defendant's possession of debt owed to Defendant."

Defendants do not argue that they are unable to identify the property (money) to which plaintiff refers.  However, the individual defendants have filed claims for various exemptions including exemptions for automobiles, home furnishings and personal effects, jewelry, earnings and bonuses, tools of the trade, life insurance policies, retirement plans, and the statutory homestead exemption. See, Williams Decl., at ¶¶46-53; Webb Decl., at Ex.3 and 6 (Lynch Decl., at ¶10 and Supp. Lynch Decl.); Webb Decl., at Ex. 1 and 5 (Gronner Decl., at ¶9 and

---

[38]Paraphrasing the language of the authorizing statute, plaintiff seeks to attach:

money of individual Defendant(s) (a) located on the premises where a trade, business or profession is conducted by Defendant(s), (b) in excess of $1,000 elsewhere than on the premises where a trade, business or profession is conducted by Defendant(s) and not in deposit accounts, (c) located in a deposit account in excess of $1,000, (d) in excess of an aggregate amount of $1,000 located in deposit accounts and in a deposit account and money located elsewhere than on the premises where a trade, business or profession is conducted by Defendant(s).

*E.g.*, Lynch Motion at 8.  We think the articulation in the text states plaintiff's entitlement more clearly.

Supp. Gronner Decl.).  See also, Cal. C.C.P. §§487.010, 487.020 and 704.010 et seq.

Exempt property includes: (1) all property exempt from enforcement of money judgments, (2) "property which is necessary for the support of a defendant who is a natural person or the family of such defendant supported in whole or in part by the defendant," (3) "earnings" as defined in section 706.011, and (4) all property not subject to attachment under section 487.010.  Cal. C.C.P. §487.020 (emphasis added).

Plaintiff opposes only one of  defendants' claimed exemptions -- that regarding funds in the individual defendants' retirement accounts.  See, Plaintiff's Objection to Claims of Exemption, filed September 6, 2006.  Defendants' retirement plans each appear to constitute "self-employed retirement plans and individual retirement annuities or accounts" within Cal. C.C.P. §704.115(a)(3). Under California law, these types of retirement funds are exempt from attachment "*only* to the extent necessary to provide for the support of the [defendant] when the [defendant] retires and for the support of the spouse and dependents of the [defendant], taking into account *all* resources that are likely to be available for the support of the [defendant] when the [defendant] retires."  Cal. C.C.P. §704.115(e) (emphasis added).  Plaintiff asserts that defendants have ample resources to support themselves and their dependents in retirement and, thus, that the funds in defendants' retirement accounts are not "necessary" for support and should not be exempt from attachment.

Whether to exempt an individual's retirement funds is a fact-specific inquiry.  Recent case law sets forth the relevant factors the Court should consider in assessing whether to exempt a specific individual's retirement funds.  Courts consider (1) defendant's present and anticipated living expenses and income, (2) age and health of the defendant and his dependents, (3) defendant's ability to work and earn a living, (4) defendant's training, job skills, and education, (5)

defendant's other assets and their liquidity, (6) defendant's ability to save for retirement, and (7) any special needs of the defendant and his dependents. *In re Davis*, 323 B.R. 732 (9th Cir. BAP 2005).

Defendants have the burden of establishing that their retirement funds are necessary to provide support for defendants and their dependents when defendants retire. *Schwartzman v. Wilshinsky*, 50 Cal. App. 4th 619 (1996). No defendant has persuaded us that he qualifies for a *complete* exemption of his retirement funds.

### (i)   <u>Virgil Williams[39]</u>

Dr. Williams is a medical doctor who earns approximately $420,000.00 in gross income per year. He is the President and CEO of MIDC. His wife does not work outside the home.

Dr. Williams owns a home he values at $1,800,000.00 and on which he has a $900,000.00 loan and $190,000.00 line of credit — thus, leaving $710,000.00 in equity. He also owns investment property valued at $600,000.00 on which he has a $250,000.00 loan leaving $350,000.00 in equity.

Dr. Williams values his retirement funds at $1,200,000.00. He also has various other assets that he values collectively at $304,000.00: vacant real estate, a tuition savings plan, an unspecified interest in his mother-in-law's home, a "time share," and various personal property. Finally, Dr. Williams states that he has 1,800,000 shares of MIDC stocks which he says are of "very questionable value," and $250,000.00 worth of loans made to MIDC, which he says also are of "very questionable value."

In addition to the debt related to his real property, Dr. Williams claims expenses and debts totaling approximately $540,000.00 (for tax liabilities, credit

---

[39]See, Williams Decl.; and Crouse Decl., at Ex. 12 and 14.

36

cards, tuition, car loans, etc.).  Thus, total liabilities, including the very large home mortgage, are roughly $1,845,000.00.

Dr. Williams did not disclose his age or that of his wife.  Dr. Williams has three dependents -- a 27 year old son, who is currently in medical school, a 12 year old son, and his 87 year old mother-in-law.  He provided no information about his health or that of any of his dependents.  Nor has he identified any special needs for the Court to consider.

Dr. Williams' ability to save for retirement appears excellent.  He has substantial liabilities, but they are far exceeded by his assets (some of which are not liquid).  Dr. Williams is currently supporting two children.  However, we presume his 27 year old son will graduate from medical school before too long, freeing up additional cash.  Finally, Dr. Williams already has $1,200,000.00 in retirement funds and has provided no reason why he would not be able to continue saving funds at the same rate he has saved in the past.

Taking into account all resources that are likely to be available when Dr. Williams retires, we RECOMMEND that the District Court find that the full extent of Dr. Williams' retirement funds are not necessary to provide for the support of Dr. Williams and his dependents when he retires.

### (ii)    John Lynch[40]

Mr. Lynch is 59 years old.  His wife is 56.  Mr. Lynch has one child, a seventeen year old daughter.  Mr. Lynch states that he recently "retired," but also describes himself as a "self-employed independent consultant."  According to his declaration, he earned $88,000.00 over some unspecified recent period.  Mr. Lynch's financial statement indicates that he earned $83,000.00 in bonuses and commissions in 2005.  There is limited information in Mr. Lynch's declaration

---

[40]See, Webb Dec., at Ex. 3(Lynch Decl.), and Ex. 6 (Supplemental Lynch Decl.); Crouse Decl., at Ex. 13 and 14.

about his training, job skills and education, other than that his last job at Agilent Technologies/Hewlett Packard was as a "Sales Consultant & Representative."  Mr. Lynch's spouse also generates income for the family.  In 2005, she earned $71,000.00 working as a "Development Director" at East Bay Agency for Children.

In his financial statement, Mr. Lynch states that he has $2,431,000 in assets, total liabilities of $644,000.00 and, thus, a net worth of $1,786,000.00.  These assets include $988,000.00 in retirement funds.  Thus, his net worth, <u>excluding</u> retirement funds, is $798,000.00.  Mr. Lynch states that he will begin drawing on his retirement account in December, when he is 59.5.  Mr. Lynch's seventeen year old daughter *may* attend college.

Mr. Lynch's family's income, including his wife's $71,000.00 annual salary, slightly outpaces their expenses, and he has a child that *may* be attending college.  These factors weigh in favor of exempting Mr. Lynch's retirement funds.  However, Mr. Lynch has a net worth of $798,000.00 <u>excluding</u> retirement funds, he continues to work as an independent consultant (and appears to earn over $80,000.00 annually), his spouse earns roughly $71,000.00, his retirement funds are $988,000.00 — much greater than the amount plaintiff seeks to attach — and his spouse has an additional $88,000.00 in an IRA.  Mr. Lynch did not identify any special needs for the Court's consideration.  There is no evidence that he is not in good health or that he could not, for some other reason, have continued to work for Agilent/Hewlett Packard or some similar company.  Considering his age, earning ability, and all the resources likely to be available to Mr. Lynch and his family for retirement, we RECOMMEND that the District Court find that the full extent of Mr. Lynch's retirement funds are not necessary to provide for the support of Mr. Lynch and his dependents when he retires.

//

//

38

### (iii)   Arthur Gronner[41]

Dr. Gronner is a medical doctor who earns approximately $240,000.00 per year. He also receives about $30,000.00 per year in social security benefits. Thus, Dr. Gronner's total yearly income is approximately $270,000.00. Dr. Gronner does not provide any information about his expenses in his declaration, but he asserts that he has "no outstanding liabilities other than the personal guarantee in this case."

Dr. Gronner's largest asset is his personal residence, which he owns outright, and which is valued at between $1,500,000.00 and $2,000,000.00. He also has $100,000.00 in "miscellaneous personal property," 550,000 shares of MIDC stock, which he characterizes as of "very questionable value," and has made $25,000 in loans to MIDC, which he also characterizes as of "very questionable value." Finally, he has retirement funds valued at $800,000.00.

Dr. Gronner is 70 years old. He is married, and his wife does not work outside the home. Dr. Gronner does not state how old his wife is or whether either of them have any problems with his or her health. Dr. Gronner has no dependents, and he has not identified any special needs for the Court's consideration.

Dr. Gronner currently earns $240,000.00 a year in gross income. His ability to save for retirement is quite good. Although he is past traditional retirement age, he did not indicate that he intends to retire in the near future. Moreover, Dr. Gronner owns very valuable assets (including a nearly $2,000,000.00 home that he owns outright), has no liabilities at all, and has no dependents (other than his spouse). Considering his age, earning ability and all of the resources likely to be available to Dr. Gronner and his family for retirement, we RECOMMEND that the District Court find that the full extent of Dr.

---

[41]See, Webb Decl., at Ex. 1(Gronner Decl.), Ex. 2 (Gronner Trust Decl.), and Ex. 5 (Supplemental Gronner Decl.); Crouse Decl., at Ex. 11 and 14.

1    Gronner's retirement funds are not necessary to provide for the support of Dr.

2    Gronner and his dependents when he retires.

3        In a related matter, Dr. Gronner also seeks to shield from attachment real

4    property held in trust.  Plaintiff argues that California Probate Code §18200 makes

5    the property in a "revocable" trust subject to claims by creditor's of the settlor.  In

6    California a trust is presumptively revocable unless expressly stated to be

7    irrevocable.  Cal. Probate Code §15400.  Defendants have confirmed that the

8    Gronner Trust is revocable.  See, Letter, filed September 25, 2006.  Accordingly,

9    we RECOMMEND that the District Court find that, under California Probate

10   Code §18200, Dr. Gronner's interest in the real property that is held in the

11   Gronner Trust is subject to attachment.

12

13                    **(iv)    Recommended exemption amount for**

14                              **retirement funds**

15       As explained in the preceding paragraphs, each of the individual defendants

16   is quite comfortable financially, is not likely to need the entire amount of his

17   retirement funds at the time of retirement, and has significant future earning

18   potential.  However, because of the importance of retirement funds generally, at

19   this juncture, we judge the amount subject to attachment conservatively.  We

20   RECOMMEND that the District Court find that $150,000.00 (1/3 of the principal

21   guaranteed amount) from <u>each</u> defendant's retirement funds is not necessary for

22   the defendants' support or that of their dependents when they retire and that the

23   Court deny the exemption to that extent at this time.  In our view, given

24   defendants' substantial assets and earning potential, defendants cannot reasonably

25   argue that the loss of $150,000.00 from their retirement accounts will disable them

26   from supporting themselves and their dependents at the time of retirement.

27       We make this recommendation on the assumption that plaintiff will be able

28   to attach sufficient property to secure defendants' full obligation ($450,000.00 in

                                    40

1   principal plus $3,000 in attorneys' fees).  Based on the evidence, each of the

2   individual defendant's has significant accessible assets aside from the retirement

3   accounts that should more than cover the full obligation.  However, because we

4   have made a conservative recommendation with respect to attachment of the

5   retirement funds, we further RECOMMEND that the District Court enter this

6   order without prejudice to plaintiff's ability to revisit the issue if plaintiff is

7   otherwise unable to attach sufficient property to cover its anticipated judgment.

8

9                    **(c)    Requirement that plaintiff post an undertaking**

10          If the District Court grants plaintiff's applications for writs of attachment

11  the Court's order must state whether plaintiff is required to post an undertaking.

12  Cal. C.C.P. §§484.090; 489.210 and 489.220.  Under California law the amount of

13  plaintiff's undertaking to secure each writ will be $10,000.00 unless defendants

14  persuade us a larger undertaking is appropriate.  Cal. C.C.P. §489.220.

15  Defendants have not objected to the presumptive statutory undertaking of

16  $10,000.00.  Therefore, if the District Court adopts our recommendation that it

17  grant plaintiff's applications for writs of attachment, we RECOMMEND that the

18  District Court require plaintiff to post an undertaking in the amount of $10,000.00

19  for each defendant whose property plaintiff intends to attach prior to issuance of

20  the writ of attachment.  Cal. C.C.P. §489.210.

21

22      **B.    Writ of Possession**

23          Plaintiff is entitled to a writ of possession if the Court finds that (1) plaintiff

24  establishes the probable validity of its claim to possession of the property, (2)

25  plaintiff satisfies the undertaking requirements of Cal. C.C.P. §515.010, and (3)

26

27

28

                                        41

1   there is probable cause to believe the property is located where plaintiff believes it

2   is.[42]  Cal. C.C.P. §512.060.  See also,  Cal. C.C.P. §§511.010 and 512.090.

3          Although plaintiff's entitlement to the writ is mandatory if the requisite

4   showing is made, defendant may "prevent" plaintiff from taking possession of the

5   goods by posting an undertaking as discussed below.  Cal. C.C.P. §515.020.

6          Plaintiff must establish the probable validity of its claim to <u>possession</u>.  We

7   described above the bases for our conclusion that plaintiff has demonstrated the

8   probable validity of its claim for <u>payment</u> under the relevant contracts.  At this

9   juncture, we must evaluate whether plaintiff also has a <u>possessory</u> interest in the

10  goods, and we must evaluate MIDC's competing claim that it holds a superior

11  possessory interest in the goods.

12         The evidence supports a finding that plaintiff has a right to possession under

13  the contract (MLA).  The express terms of the MLA permit PMC to take

14  possession of the goods in the event MIDC defaults under the MLA.  In the event

15  of default, PMC ("Lessor") may

16         remove and take possession of any or all items of System, without
        demand or notice, wherever same may be located, with or without any
17         court order or pre-taking hearing or other process of law.

18  Webb Decl., at Ex. 7 (MLA, attached as Ex. 4 to Cross Complaint, at ¶14).

19         Based on the express terms of the MLA, we RECOMMEND that the

20  District Court find that, at this juncture, plaintiff has established the probable

21  validity of its claim to possession of the equipment.

22         MIDC argues that, even if it accepted the goods, it has effectively revoked

23  that acceptance.  If it effectively revoked the acceptance, MIDC asserts that it has

24  acquired a security interest in the goods (pursuant to section 2711 of the UCC) for

25  the amount of any payments MIDC made prior to revocation.

26  //

27

28         [42]As with the writ of attachment, the probable validity of plaintiff's claim is the only
    element subject to genuine dispute.

Pennsylvania's UCC says the following about revocation.

(a) **Grounds for revocation** – The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it:
(1) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
(2) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the assurances of the seller.

(b) **Time and notice of revocation** – Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(c) **Rights and duties of revoking buyer** – A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

13 Pa.C.S. §2608.

The evidence might support an inference that MIDC initially accepted the equipment "on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured." That kind of finding, however, would not be sufficient to establish a valid revocation. MIDC also would need to demonstrate that its revocation occurred within a "reasonable time." 13 Pa.C.S. §2608(b). Defendants have not submitted evidence sufficient to show that it is more likely than not that their effort to revoke was timely.[43]

As noted above, MIDC did not "revoke" its acceptance until thirteen months after receiving the final shipment of equipment. Given the importance of the

---

[43]Defendants contend that their written letters of revocation dated June 13, 2006, constitute prima facie evidence that MIDC revoked any acceptance of the goods and that the burden therefore shifts to plaintiff to demonstrate that revocation was ineffective. Transcript September 20, 2006, hearing; Crouse Decl., at Ex. 18. The query under the UCC is whether revocation occurred <u>within a reasonable time</u>. Unless it is clear from the face of the letter(s) that the revocation was made within a reasonable time, the mere existence of the letter does not respond to this query.

Revocation is MIDC's defense, and we suspect the burden to establish that defense lies with MIDC. Nonetheless, even if it is plaintiff's burden to establish the absence of effective revocation, as explained *infra*, we find that the current state of the record supports a finding that plaintiff has demonstrated the probable validity of its claim that MIDC did not revoke its acceptance of the goods within a reasonable time and, therefore, that revocation is not effective.

43

equipment to defendants' livelihood, we are inclined to the view that a reasonable commercial party would have revoked acceptance of these kinds of goods long before thirteen months had passed and the lender filed a complaint for breach of contract. Moreover, defendant has failed to provide any evidence about the specific efforts PMS allegedly made to cure the defects. Without knowing when and how often PMS tried to cure the defects, and what PMS told defendants about its ability to cure and how long cure would take, we cannot conclude that MIDC's conduct was reasonable under the circumstances. Accordingly, we RECOMMEND that the District Court find that MIDC has not established that it revoked its acceptance of the goods within a reasonable time and, therefore, has not established that it is likely to have a security interest in the goods as a result of revocation.

If the Court permits plaintiff to repossess the MRI equipment, plaintiff must post an undertaking pursuant to Cal. C.C.P. §515.010. However, MIDC wishes to retain possession of the goods and may do so if it posts an undertaking as provided in Cal. C.C.P. §515.020. Plaintiff does not object to MIDC's request to retain possession of the goods on the condition that MIDC posts an adequate undertaking. Transcript September 20, 2006, hearing. The MRI equipment is the essential basis for generating virtually all of MIDC's revenue. Webb Decl., at Ex. 4 (Garvey Decl.). Without the MRI machine MIDC is likely to become insolvent. We find that it is in both parties' interests for MIDC to retain possession and a right to use the goods.

MIDC must, however, post an undertaking adequate to compensate plaintiff for damages that are "proximately caused by the plaintiff's failure to gain . . . possession." Cal. C.C.P. §515.020(b) (emphasis added). If plaintiff obtains possession of the goods it will be entitled to sell them in order to recoup some of its anticipated losses. Plaintiff requests that the undertaking cover the current market value of the equipment – the amount plaintiff likely will recoup if it

obtains possession of and sells the equipment.  Because defendants intend to continue using the MRI equipment during the course of the litigation, plaintiff notes that the machine is likely to depreciate in value during that time as the technology becomes increasingly dated and as the machine sustains additional wear and tear.  It is possible that as a result of damage, or of changes in market conditions, the equipment might even become valueless.  An undertaking sufficient to cover the current market value would compensate plaintiff for the loss of the ability to sell the goods now.

PMC submits evidence from an appraiser about the "forced" liquidation value of the goods and the "orderly" liquidation value of the goods.  Declaration of William Corwin re: Forced Liquidation and Orderly Liquidation Value of Equipment, filed August 4, 2006.  If PMC conducts an "orderly" sale – one in which PMC leaves the MRI equipment at MIDC and conducts a sale in place at that location – the appraiser expects PMC to receive $450,000.00.  Corwin Decl., at ¶6 and Ex. 1; Transcript, September 20, 2006 hearing.  If, on the other hand, plaintiff must remove the MRI machine from MIDC and sell it after removal, a "forced liquidation," the appraiser would expect PMC to net $375,000.00.  *Id*., Transcript, September 20, 2006 hearing.

Defendants object to an undertaking sufficient to cover the current market value of the goods and argue instead that the value to plaintiff of loss of possession is the lost rental value of the MRI machine.  Opposition at 24.  However, defendants also concede that it would be unrealistic for plaintiff to remove the equipment and rent it temporarily to another medical facility because of the complexity of installing and uninstalling this kind of machinery.  *Id*.; Transcript September 20, 2006, hearing.

Given the infeasibility of temporarily renting equipment of this kind, we conclude that plaintiff's likely damages consist of the loss of the ability to sell the equipment at its current market value.  However, plaintiff has not convinced us

45

that it would be more likely to conduct an orderly liquidation than a forced liquidation. Therefore, we find that the appropriate amount of the undertaking is $375,000.00, the appraised "forced" liquidation value. Plaintiff also asks us to increase the undertaking to cover any costs plaintiff might incur if it ultimately is compelled to remove the equipment. Transcript, September 20, 2006, hearing. Although California law entitles plaintiff to costs, plaintiff has not submitted evidence that would enable us to estimate those costs. We cannot, therefore, recommend an award of costs at this time.

For the reasons stated, we RECOMMEND that the District Court find that plaintiff is entitled to a writ of possession. We further RECOMMEND that the District Court permit MIDC to retain possession of the MRI equipment on the condition that MIDC posts an undertaking in the amount $375,000.00.

## III.   **Conclusion**

For the reasons stated above, we RECOMMEND that:

- the District Court grant plaintiff's application for a writ of attachment against MIDC to secure the amount $2,514,798.06,

- the District Court issue a writ of attachment against MIDC that authorizes the levying officer to attach "all corporate property for which a method of levy is provided by Article 2 [Cal. C.C.P. §488.300 et seq.]" and to take possession of documentary evidence in Defendant's possession or control of title to property and documentary evidence in Defendant's possession or control of debt owed to Defendant,

- the District Court grant plaintiff's applications for a writ of attachment against each of the individual defendants to secure the amount $453,000.00,

- the Court issue a writ of attachment against each of the individual defendants (1) that permits attachment of the property identified by plaintiff in the application, and permits the levying officer to take possession of

46

1   documentary evidence in Defendant's possession or control of title to

2   property and documentary evidence in Defendant's possession or control of

3   debt owed to Defendant, and (2) that grants each of the exemptions asserted

4   by defendants except that the exemptions for the retirement accounts be

5   limited to those sums in excess of $150,000.00 for each defendant, and that

6   the District Court rule that the limitation on retirement funds is made

7   without prejudice to plaintiff's right to renew its application to attach

8   additional retirement funds if plaintiff is unable to secure the full amount of

9   the obligation,

10  •   the Court require plaintiff to post four undertakings in the amount

11  $10,000.00 (one for each defendant against whom plaintiff intends to attach

12  property), and

13  •   the Court grant plaintiff's application for a writ of possession but permit

14  MIDC to retain possession and use of the goods on the condition that MIDC

15  posts an undertaking in the amount $375,000.00.

16  See, attached Proposed Order.

17  IT IS SO REPORTED AND RECOMMENDED.

18  Dated: October 11, 2006

19                                          /s/ Wayne D. Brazil
                                            WAYNE D. BRAZIL
20                                          United States Magistrate Judge

    Copies to:
21  parties,
    JSW, wdb, stats
22

23

24

25

26

27

28